United States District Court
For the Northern District of California

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

WILLIAM W. LOYD,

Plaintiff,

v.

CAROLYN W. COLVIN,[1] Acting Commissioner, Social Security Administration,

Defendant.

Case No. 5:12-CV-01991-LHK

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**[Re: ECF Nos. 17, 23]**

Plaintiff William W. Loyd ("Loyd") appeals a final decision of the Commissioner of Social Security denying his application for a period of disability and disability insurance benefits under Title II of the Social Security Act. Before the Court are the parties' cross-motions for summary judgment, which have been fully briefed. *See* ECF Nos. 17, 23, 24. Upon consideration of the briefing[2] and for the reasons set forth below, the Court DENIES Loyd's motion and GRANTS the Commissioner's motion.

[1] Carolyn W. Colvin, the Acting Commissioner of Social Security, is substituted as the defendant in this action in place of her predecessor, Michael J. Astrue. *See* Fed. R. Civ. P. 25(d).

[2] This matter was submitted without oral argument pursuant to Civil Local Rule 16-5.

United States District Court
For the Northern District of California

## I. BACKGROUND

Loyd was born in 1969, has a high school education, and has past relevant work as a network control operator, user support analyst, and electronics technician. Admin. R. ("AR") 54. On January 29, 2009, he applied for a period of disability and disability insurance benefits,[3] alleging disability as of July 1, 2007. AR 102-05. He claimed inability to work because of anxiety, panic attacks, sleep apnea, pain in the low back and knee, and pain in the hands and wrists. AR 60, 75. Loyd's application was denied initially and upon reconsideration. *Id*. An Administrative Law Judge ("ALJ") conducted a hearing on September 20, 2010. AR 43. On September 23, 2010, the ALJ issued a written decision concluding that Loyd was not disabled and thus was not entitled to disability insurance benefits. AR 43-55. The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. AR 1. Loyd now seeks judicial review of the denial of benefits.

## I. LEGAL STANDARD

### A. Standard of Review

This Court has the authority to review the Commissioner's decision to deny benefits. 42 U.S.C. § 405(g). The Commissioner's decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Moncada v. Chater*, 60 F.3d 521, 523 (9th Cir. 1995). In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance – it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." *Moncada*, 60 F.3d at 523; *see also Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992). When determining whether substantial evidence exists to support the Commissioner's decision, the court examines the administrative record as a whole, considering adverse as well as supporting evidence. *Drouin*, 966 F.2d at 1257; *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). Where evidence exists to support more than one rational

---

[3] The Commissioner's brief indicates that Loyd applied for both disability insurance benefits and Supplemental Security Income ("SSI"). Comm'r's Br. at 1, ECF No. 23. However, Loyd's application sought only disability insurance benefits and stated expressly that he did not want to file for SSI. AR 102.

United States District Court
For the Northern District of California

interpretation, the court must defer to the decision of the Commissioner. *Moncada*, 60 F.3d at 523; *Drouin*, 966 F.2d at 1258.

**B. Standard for Determining Disability**

Disability benefits are available under Title II of the Social Security Act when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

"ALJs are to apply a five-step sequential review process in determining whether a claimant qualifies as disabled." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009). At step one, the ALJ determines whether the claimant is performing "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled; if not, the analysis proceeds to step two. *Id*. At step two, the ALJ determines whether the claimant suffers from a severe impairment or combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). If not, the claimant is not disabled; if so, the analysis proceeds to step three. *Id*. At step three, the ALJ determines whether the claimant's impairment or combination of impairments meets or equals an impairment in the Listings. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is disabled; if not, the analysis proceeds to step four. *Id*. At step four, the ALJ determines whether the claimant has the residual functional capacity ("RFC") to do his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If so, the claimant is not disabled; if not, the analysis proceeds to step five. *Id*. At step five, the ALJ determines whether the claimant can do other jobs in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If so, the claimant is not disabled; if not, the claimant is disabled. *Id*. "The burden of proof is on the claimant at steps one through four, but shifts to the Commissioner at step five." *Bray*, 554 F.3d at 1222.

**III. DISCUSSION**

The ALJ determined that Loyd's earnings records showed that he had acquired sufficient quarters of coverage to remain insured through December 31, 2009 ("date last insured"). AR 43. The ALJ found that between Loyd's alleged onset date of July 1, 2007 and his date last insured, Loyd did not perform substantial gainful activity (step one); did have a severe combination of

United States District Court
For the Northern District of California

impairments consisting of anxiety with agoraphobia, depression, morbid obesity, and back/knee pain (step two); did not have impairments equaling an impairment in the Listings (step three); and did not have the RFC to perform past relevant work (step four). AR 45-46, 53-54.

The ALJ found that Loyd had the RFC to perform light work with the limitations that he: "is limited to occasional stooping, crouching, crawling, kneeling, and climbing ramps/stairs"; "must avoid all ladders/ropes/scaffolds"; "must avoid more than frequent (not constant) balancing"; "must avoid concentrated exposure to moving machinery and unprotected heights"; "is limited to simple, routine, and repetitive tasks"; and "is limited to low stress work (defined as no more than occasional decision-making and occasional changes in the work setting)." AR 48. Additionally, the ALJ determined that "[a]ll work must be essentially isolated, requiring only occasional supervision." *Id*. Based upon this RFC, and the testimony of a vocational expert, the ALJ concluded that Loyd could do other jobs that existed in significant numbers in the national economy (step five). AR 54.

Loyd challenges the ALJ's step five determination, asserting that the ALJ erred in crediting the opinion of an examining physician over that of Loyd's treating physicians; rejected Loyd's subjective complaints without a sufficient basis to do so; and ignored one of the limitations in Loyd's RFC when finding that he could perform other jobs in the national economy.

**A. Medical Evidence**

When evaluating medical evidence, an ALJ must give a treating physician's opinion "substantial weight." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009). "When evidence in the record contradicts the opinion of a treating physician, the ALJ must present 'specific and legitimate reasons' for discounting the treating physician's opinion, supported by substantial evidence." *Id.* (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). When a treating physician's opinion is not contradicted by another physician, the ALJ must provide "clear and convincing" reasons for disbelieving the treating physician. *Id.* at 1228 n.8.

In adopting a RFC of a limited range of light work, the ALJ gave significant weight to the opinion of a consulting psychiatrist, Antoinette Acenas, M.D., and less weight to the opinions of Loyd's treating physicians, psychiatrist Joanne Markle, M.D., and psychologist W. Douglas Finer, Ph.D. AR 50-51. Because the ALJ relied upon another physician's opinion as a basis for

United States District Court
For the Northern District of California

discounting the treating physicians' opinions, the ALJ need only articulate "specific and legitimate" reasons for doing so, supported by substantial evidence. *See Bray*, 554 F.3d at 1228.

The evidence in the record is summarized below[4]:

**Joanne Markle, M.D. (Treating Physician)**

Loyd saw Joanne Markle, M.D., for a psychiatric evaluation in December 2008. AR 243-49. He told her that he was thirty-nine years old, had not worked in four years, lived with his parents following a bankruptcy, and had not left the house for anything other than doctors' appointments in a year. AR 243. He reported that he was taking Celexa, which helped his mood a little bit but not his anxiety. *Id*. Dr. Markle observed that Loyd was "very obese." AR 245. In a later evaluation Dr. Markle noted that Loyd weighed 490 pounds at his maximum. AR 418. Her assessment was "panic disorder with agoraphobia, depression, sleep disturbance and highly elevated BMI." AR 246. She directed him to continue with the Celexa and to start taking Clonazepam. *Id*.

At a second appointment a few weeks later, Loyd reported that his anxiety was a little reduced and that he had been out a few times more than usual. AR 236. He stated that he was taking a higher dose of Celexa but that the Clonazepam made him too sleepy; Dr. Markle prescribed Ativan and Wellbutrin in place of Clonazepam. *Id*.

Dr. Markle spoke with Loyd on the telephone in January 2009. AR 234. She observed that he was "doing relatively well with the medication change," and that his mood was good. *Id*. Loyd stated that he was looking into applying for Social Security benefits and she responded, "I am happy to fill out whatever SS sends me." *Id*. She also warned him that Social Security usually turns everyone down the first time. *Id*.

On May 13, 2009, Dr. Markle completed a check-the-box mental medical source statement that, *inter alia*, evaluated Loyd with respect to twenty work-related mental functions. AR 415-18. She indicated that Loyd would have moderate limitations in ten of the functions, and an above moderate limitation in one of the functions, specifically, "[a]bility to respond appropriately to

[4] Although Loyd claims disability resulting from a combination of physical and mental impairments, in this appeal he asserts that his mental impairments alone are outcome-determinative, and he limits his arguments to those impairments. *See* Pl.'s Br. at 13 n.75, ECF No. 17. Accordingly, this order addresses only the medical evidence relating to Loyd's mental impairments.

United States District Court
For the Northern District of California

changes in the work setting." AR 416-17. She opined that those limitations applied as of September 2008, which was shortly before she began treating Loyd. AR 418. She also stated that Loyd would have good days and bad days, and could be expected to miss more than four days of work per month. AR 417.

**Barbara Largent, MFT (Treating Source)**

In November 2008, Loyd was referred to Barbara Largent, MFT, for evaluation. AR 250. Loyd told Ms. Largent that he lived with his parents, that he had suffered worsening panic attacks over the past fifteen months, that someone else drives him whenever he goes anywhere, and that he had not left his home for a year except to go to doctors' appointments and to go out to lunch on one occasion. *Id*. He said that he believed that the trigger for his panic attacks was declaring bankruptcy while simultaneously being involved in a dispute with an auto dealership over a vehicle breakdown. *Id*. Loyd reported taking Celexa for the panic attacks, stating that it "has taken the edge off" but that he still could not leave the house easily. *Id*. Ms. Largent's assessment was panic attacks, depression, and other conditions including obesity. *Id*. at 252. Ms. Largent recommended a book called "An End to Panic" and panic disorder classes; Loyd agreed to read the book but did not feel able to take the classes. *Id*. at 250. He wanted to see if medication could help him feel able to attend the classes. *Id*.

At a second appointment in December 2008, Loyd reported that he had seen Dr. Joanne Markle for a medical evaluation and was taking medications that she had prescribed. AR 241. The medications had made him extremely sleepy. *Id*. However, he was very pleased that since taking the medications he had been able to take his nephew out to lunch and to drive himself. *Id*. He had not gotten the book that Ms. Largent had recommended and still did not feel able to take the panic disorder classes, although he stated that he would get the book and would take the classes when he felt able to do so. *Id*.

In February 2009, Loyd reported positive effects from the medications prescribed by Dr. Markle in that "he feels happier." AR 232. He said that when company comes to his home, "he can enjoy them and take part in the conversations and not go to his room while they are there." *Id*. He expressed interest in joining a gym. *Id*. He stated that he was applying for Social Security disability

United States District Court
For the Northern District of California

benefits. He had not gotten the panic disorder book. *Id*.

Loyd saw Ms. Largent again in September 2009. AR 407. He reported that he had attended four out of eight panic classes, but that the instructor had gone on vacation and the series had not been completed. *Id*. He agreed to retake the classes. *Id*. He was planning to have gastric bypass surgery. *Id*. He was able to go to appointments to move forward with the surgery and to attend a support group for people with gastric bypass. *Id*.

In October 2009, Loyd reported that he was feeling good about himself. AR 405. He had been exercising at home, had lost sixty-four pounds, and was awaiting a surgery date for gastric bypass. *Id*. He had been able to go to two auto parts stores with his nephew. *Id*. He was scheduled to retake the panic classes. *Id*.

In December 2009, Loyd reported that he had not gone out of the house much in the past couple of weeks. AR 403. Ms. Largent noted that he had not done any of the things she had suggested to help him reduce his anxiety – he had not read the panic disorder book, and he was not interested in taking the panic classes. *Id*. He expressed anxiety about family tensions that arose over the Christmas holidays, and when Ms. Largent suggested coping mechanisms Loyd responded with "yes, but . . . ." *Id*. When Ms. Largent pointed that out, Loyd agreed that he was "in the habit of finding things that won't work." *Id*. Loyd did seem excited about having gastric bypass surgery, which he hoped to do in February 2010. *Id*. Ms. Largent suggested taking a break from therapy until Loyd felt ready and willing to follow her recommendations to address his panic disorder. *Id*. Loyd agreed. Ms. Largent speculated that it was "not clear if some of the lack of follow through may be secondary gain for getting disability." *Id*.

**Antoinette Acenas, M.D. (Examining Physician)**

In March 2009, Loyd was examined by a psychiatrist, Dr. Antoinette Acenas. AR 266-69. In her evaluation, Dr. Acenas recounted Loyd's history, including his panic attacks, difficulty in leaving the house, medications (Celexa, Ativan, and Wellbutrin), and treatment by Ms. Largent and Dr. Markle. AR 266. Loyd stated that he would start attending a panic group in May 2009, and that he had not felt able to attend previously because he had not been able to leave the house. *Id*. Dr. Acenas noted that Loyd's hygiene and grooming were good, that he was coherent, and that he

United States District Court
For the Northern District of California

reported being able to do household chores and socialize with a few of his friends. *Id.* She diagnosed him with panic disorder with agoraphobia, sleep apnea, and obesity. AR 268. She opined that Loyd was receiving appropriate psychiatric treatment and that "[t]he likelihood of recovery is good with adaptation of cognitive behavior and therapy as in the panic group." *Id.* She observed that he had basic mathematical skills, and opined that he was able to perform simple, repetitive tasks, and to accept instructions from supervisors. *Id.* Dr. Acenas stated that, "[a]lthough the claimant does have panic disorder with agoraphobia, if treated appropriately with his psychiatric regimen, he will be able to perform work on a consistent basis as well as maintain a regular attendance and finish a normal workweek." *Id.* She further opined that "[h]e will likewise also be able to deal with the usual stress encountered in competitive workplace." *Id.*

**W. Douglas Finer, Ph.D. (Treating Physician)**

Dr. W. Douglas Finer, a psychologist, treated Loyd from January 2010 through July 2010. AR 354-401. At the first appointment in January 2010, Loyd recounted his history, including the bankruptcy, living with his parents, his anxiety, and his difficulty leaving the house. AR 393. Loyd reported that he spent his days at home on the computer or watching movies. *Id.* He stated that he had begun mental health treatment in late 2008, but that he "has not found that very helpful." *Id.* Dr. Finer noted that Loyd was referred to classes that he had attended in part but had never completed. *Id.* Loyd informed Dr. Finer that he had lost seventy-three pounds in preparation for gastric bypass surgery, which he hoped to have in February 2010. *Id.* Dr. Finer noted that Loyd had applied for Social Security disability benefits and had retained an attorney to pursue that application. *Id.* Dr. Finer prescribed individual therapy and continuance of current medications. *Id.*

Over the next several months, Loyd reported unsuccessful attempts to go to the gym that culminated in him feeling anxiety in the parking lot and leaving. *See, e.g.*, AR 377. Loyd elected to postpone the gastric bypass surgery. *Id.* He obtained his prior treatment records and complained that his past therapist had overstated his progress. AR 375. He agreed to use a relaxation CD and to attempt a trip to a nearby park. *Id.* Loyd reported increasing depression throughout March, April, and May 2010. AR 362, 364, 371, 373. However, he disclosed that he had cleared out much of his parents' garage because he wanted to do something nice for them and to donate items to those in

need. AR 362. In June 2010, he was able to go to a park and get out of his truck for a few minutes. AR 360. In July 2010, Loyd reported that he had lost ninety-four pounds by diet and portion control, and had decided against gastric bypass surgery. AR 358. However, he was discouraged and irritable and viewed personal setbacks as evidence that life is unfair. *Id*. He stated that he no longer could afford health insurance. *Id*. Dr. Finer saw Loyd two more times before the insurance lapsed, discussing basic coping strategies. AR 354, 356.

On August 23, 2010, Dr. Finer completed a check-the-box mental medical source statement that, like the earlier statement Dr. Markle had completed, evaluated Loyd with respect to twenty work-related mental functions. AR 398-401. Dr. Finer indicated that Loyd would have marked limitations in a number of functions, and in particular found that Loyd would have "[t]otal distraction" with respect to ability to: perform activities within a schedule and maintain regular attendance; work in coordination with or proximity to others; complete a normal workday/workweek; interact appropriately with the general public; respond appropriately to changes in the work setting, and travel in unfamiliar places or use public transportation. AR 399-400. Dr. Finer stated that those limitations applied as of July 1, 2007. AR 401. He also opined that Loyd would have good days and bad days, and would miss more than four days of work per month. AR 400.

**Loyd's Testimony:**

Loyd testified that he has panic attacks when he tries to leave the house. AR 20. He described the symptoms of his panic attacks, including nausea, cold sweat, racing heart, and shaking hands. AR 21. He stated that because he has extreme difficulty getting out of the house, he was unable to seek gainful employment. AR 20. Loyd testified that generally he was comfortable with living with his parents and nephew, although he still felt the need to isolate himself occasionally. AR 19, 23. He admitted that he made progress after seeking treatment, in that he was able to leave the house more often, and drive himself around. AR 21-22. Loyd testified that he had not been to a grocery store or any other type of store "in a long time." AR 26. When the ALJ asked about Ms. Largent's note describing an occasion on which Loyd went to the auto parts store with his nephew, Loyd stated that the therapist's notes were "incomplete," and that Loyd had gone to the auto parts

United States District Court
For the Northern District of California

store to help with "almost an emergency type situation." AR 26-27. Loyd explained that his nephew was starting a new job the following day, and had twice come home from the store with the wrong auto part; Loyd ended up going with his nephew to make sure he got the right parts. AR 27. Loyd testified that mostly he stayed at home, helping out around the house, surfing the Internet, and watching movies. AR 24, 28-30. However, he said that he cannot concentrate on any one task for more than an hour or hour and a half. AR 24.

**ALJ's Evaluation Of Evidence:**

The ALJ considered all of the above evidence in concluding that Loyd had the RFC to perform light work with the specified limitations.[5] The ALJ noted evidence of Loyd's improvement throughout late 2008 and 2009, as documented by Dr. Markle and Ms. Largent. AR 49-51. In particular, the ALJ noted instances in which Loyd reported improved mood, decreased anxiety, ability to drive himself, and occasions on which he was able to take his nephew out. *Id*. The ALJ observed that Loyd's condition appeared to be stable on medication, and that after starting medication Loyd was able to take positive steps such as losing significant weight, cleaning his parents' garage, and going to a neighborhood park. AR 50. The ALJ viewed Loyd's testimony to be consistent with this evidence of improvement, pointing out that Loyd isolated himself only "occasionally" and admitted to improvement once he started treatment. *Id*.

The ALJ gave "significant weight" to Dr. Acenas's opinion, because he found it to be consistent with the record as a whole. AR 50. In particular, the ALJ relied on Dr. Acenas's statements that Loyd was receiving appropriate psychiatric treatment and that the likelihood of recovery was good. *Id*.

The ALJ gave Dr. Markle's mental medical source statement limited weight, to the extent that it was consistent with the assessed RFC. AR 51. Where Dr. Markle's statement was inconsistent with the RFC, the ALJ discounted Dr. Markle's opinion on the grounds that Dr. Markle

[5] The ALJ also considered evidence regarding Loyd's physical impairments in determining Loyd's RFC. *See* AR 48-53. Because Loyd limits his appeal to arguments relating to his mental impairments, *see* Pl.'s Br. at 13 n.75, ECF No. 17, the additional evidence regarding physical impairments is not discussed herein.

United States District Court
For the Northern District of California

saw Loyd "only intermittently" and did not see Loyd after January 2009,[6] a period in which Loyd continued to improve. AR 51. The ALJ also felt that Dr. Markle's January 2009 statement that she would be "happy" to fill out "whatever SS sends," AR 234, indicated that Dr. Markle might be acting as an advocate for Loyd, AR 51.

The ALJ gave Dr. Finer's mental medical source statement "very little weight." AR 51. The ALJ was not persuaded by Dr. Finer's representation that the limitations he noted applied as of July 1, 2007 (the date last insured), when Dr. Finer first saw Loyd two and a half years later, in January 2010. AR 51. The ALJ also stated that "Dr. Finer did not have a longitudinal history with the claimant, only first seeing the claimant on January 20, 2010." *Id*. The ALJ found that Loyd was not candid with Dr. Finer, complaining that his previous treatment had not been helpful when in fact the record indicates that Loyd had improved as a result of the previous treatment. AR 51. The ALJ also concluded that Dr. Finer's mental medical source statement was inconsistent with his own treatment notes and with the record as a whole. *Id*.

Loyd raises several troubling aspects of the ALJ's reasoning, for example, the anomaly in discounting Dr. Markle's opinion because she saw Loyd only "intermittently," and discounting Dr. Finer's opinion because he did not have "a longitudinal history" with Loyd, but crediting Dr. Acenas's opinion even though she saw Loyd only *once*. The ALJ's reference to Dr. Finer's lack of longitudinal history with Loyd is puzzling in light of the fact that Dr. Finer saw Loyd for seven months beginning in January 2010. It may be that the ALJ was referencing the fact that Loyd's date last insured was December 31, 2009, *before* Dr. Finer started seeing Loyd; thus only Dr. Finer's earliest notes would be particularly relevant to a disability evaluation for the period July 1, 2007 through December 31, 2009.

Loyd also points out that Dr. Acenas's opinion, dated March 2009 – almost two years into the period for which disability benefits are sought – is couched in terms of what work Loyd "*will* be able to perform" if given appropriate treatment. AR 268 (emphasis added). Loyd argues that Dr. Acenas's opinion provides no basis for concluding that he *was* able to work prior to March 2009.

[6] The ALJ's decision actually states that Dr. Markle did not see Loyd until after January, *2010*; however, it is clear from the context and from the record that the ALJ meant January 2009, which in fact is the last date that Dr. Markle treated Loyd.

United States District Court
For the Northern District of California

While the points raised by Loyd do undercut the ALJ's determination, the ALJ articulated other reasons for discounting the treating physicians' opinions. With respect to Dr. Markle, the ALJ pointed out statements that could be construed as suggesting that she would act as Loyd's advocate, and noted that Dr. Markle stopped seeing Loyd at a time when Loyd was starting to improve significantly. AR 50-51. With respect to Dr. Finer, the ALJ noted Loyd's lack of candidness with Dr. Finer regarding the efficacy of prior treatment, and the fact that Loyd's reported setbacks occurred during the period in which he was waiting for the results of his application for Social Security disability benefits. *Id*. Although it is a close question, the Court concludes that the ALJ presented specific and legitimate reasons, supported by substantial evidence, for discounting the opinions of Dr. Markle and Dr. Finer.

**B. Subjective Complaints**

Once a claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence. *Lester*, 81 F.3d at 834. Unless there is affirmative evidence of malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." *Id.* "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Id.*

As discussed at length above, the medical record is clear that Loyd suffered from anxiety and depression; accordingly there is no question that Loyd had underlying impairments that could give rise to a number of symptoms. Loyd testified at the administrative hearing that his panic attacks are so severe that he cannot leave the house frequently, and that he cannot concentrate on a task for more than and hour or hour and a half at a time. AR 24, 28-30. The ALJ acknowledged that Loyd's impairments reasonably could be expected to cause those symptoms, but determined that Loyd's statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with" the assessed RFC. AR 53. The ALJ gave a number of reasons for his determination, including the fact that Loyd failed to follow recommended treatment to obtain relief from his symptoms and engaged in daily activities inconsistent with the claimed severity of his symptoms. AR 53. As discussed above, on several occasions Ms. Largent

United States District Court
For the Northern District of California

recommended that Loyd read a panic disorder book and attend a series of classes, but he failed to follow through. Ultimately Ms. Largent suggested that Loyd take a break from therapy until he was willing to follow her treatment recommendations to address his panic disorder. AR 403. Ms. Largent speculated that it was "not clear if some of the lack of follow through may be secondary gain for getting disability." *Id*. With respect to Loyd's claim that he could not concentrate for more than an hour or hour and a half, the ALJ noted that Loyd plays computer games, which require a significant degree of concentration, and that he observed Loyd sitting and concentrating for a lengthy period of time at the administrative hearing. AR 47, 53. The Court concludes that these are "clear and convincing" reasons for failing to credit fully Loyd's subjective complaints. While other evidence in the record might justify a different determination, the ALJ's determination satisfies the applicable legal standards; thus it is not the role of the Court to second-guess it. *See Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001).

**C. Vocational Expert**

As noted above, "[t]he burden of proof is on the claimant at steps one through four, but shifts to the Commissioner at step five." *Bray*, 554 F.3d at 1222. "The ALJ may meet his burden at step five by asking a vocational expert a hypothetical question based on medical assumptions supported by substantial evidence in the record and reflecting all the claimant's limitations, both physical and mental, supported by the record." *Hill v. Astrue*, 698 F.3d 1153, 1161 (9th Cir. 2012). If the hypothetical does not reflect all of the claimant's limitations, then the vocational expert's testimony has no evidentiary value. *Id*. at 1162.

As set forth above, the ALJ found that Loyd had the RFC to perform light work with the limitations that he: "is limited to occasional stooping, crouching, crawling, kneeling, and climbing ramps/stairs"; "must avoid all ladders/ropes/scaffolds"; "must avoid more than frequent (not constant) balancing"; "must avoid concentrated exposure to moving machinery and unprotected heights"; "is limited to simple, routine, and repetitive tasks"; and "is limited to low stress work (defined as no more than occasional decision-making and occasional changes in the work setting)." AR 48. Additionally, the ALJ determined that "[a]ll work must be essentially isolated, requiring only occasional supervision." *Id*.

United States District Court
For the Northern District of California

At the administrative hearing, the ALJ posed a number of hypotheticals to a vocational expert ("the VE") that were based on the assessed RFC. *See* AR 32-34. In the first hypothetical, the ALJ asked the VE to assume a person of Loyd's age, education, and work experience, who had a RFC to do light work with the above limitations relating to climbing, balancing, moving machinery and heights, and who was limited to simple, repetitive tasks. AR 32. The VE testified that such an individual would be able to work as a small parts assembler or a bench assembler. *Id*.

The ALJ then asked the VE a second hypothetical assuming the same individual, and adding that the individual is limited to low stress work. AR 33. The ALJ specified that "[t]his individual can be around employees throughout the work day but only [sic] conversations and interpersonal interactions. I'll add to that that no jobs where an essential function of the job is communicating with the public." *Id*. The VE testified that the additional limitations would not erode the individual's ability to do the jobs of small parts assembler or bench assembler. AR 34.

In a third hypothetical, the ALJ asked the VE to assume the same individual, and to add the limitation that "[t]his work would essentially be isolated with only occasional supervision." *Id*. The VE testified that a small parts assembler or bench assembler would have only occasional supervision, but would be around ten to fifty workers in a general work area. *Id*.

In his written decision, the ALJ concluded that, based upon the assessed RFC and the VE's testimony, Loyd could do the jobs of small parts assembler or bench assembler, of which there are more than 150,000 jobs in California and more than 1,000,000 jobs nationally. AR 54. Loyd challenges this decision, contending that the VE's testimony made it clear that a small parts assembler or bench assembler would *not* work in isolation, but rather would work with between ten and fifty other employees. Loyd argues that the limitation that "[a]ll work must be essentially isolated, requiring only occasional supervision," *see* AR 48, requires both that all work must be "essentially isolated" *and* that the work must require "only occasional supervision."

The Commissioner argues that Loyd's interpretation of the RFC is inconsistent with the manner in which the ALJ posed the hypotheticals. In the second hypothetical, the ALJ specified that the individual could work around others, but could not have communication with the public. The third hypothetical built on the second hypothetical. Therefore, the Commissioner argues, when

United States District Court
For the Northern District of California

the ALJ added the limitation at issue, he could not have meant that the individual would work in isolation from all other employees, because the imagined individual specifically worked with other employees per the second hypothetical. Thus Commissioner argues that the limitation at issue means only that the employee generally is isolated *from supervision*.

While the Court could wish that the ALJ had been more precise in formulating the RFC and in posing the hypotheticals, the Court agrees with the Commissioner that based upon this record the ALJ could not have intended that the limitation at issue require isolation from all other workers. The VE made it entirely clear during testimony that a small parts assembler or bench assembler would have only occasional supervision, but would be around co-workers. If the ALJ had intended to incorporate into the hypothetical a limitation of isolation from co-workers, he easily could have done so at that point in the proceedings. Accordingly, the Court concludes that the assessed RFC does not require isolation from co-workers but rather essential isolation from supervision. Given that conclusion, the VE's testimony is adequate to meet the Commissioner's burden at step 5.

**IV. ORDER**

For the foregoing reasons, IT IS ORDERED THAT:

1. Plaintiff's motion for summary judgment is DENIED;
2. Defendant's motion for summary judgment is GRANTED; and
3. The Clerk shall close the file.

Dated: September 19, 2013

Lucy H. Koh

LUCY H. KOH
UNITED STATES DISTRICT JUDGE